Thank you. Judges, good morning. Chris Trombetta for the appellant, Nancy Bailey. May it please the court. This case concerns Ms. Bailey's termination from Pricewaterhouse. She claims that it was a function of retaliation in connection with her reporting conduct as to a game manager, as to Jonathan Recore. Ms. Bailey had been an associate at Pricewaterhouse, been at the firm for 18 years, been an associate for 8 years. She had worked on the IFR project, which is an assignment on which she was working at the time all the incidents arose as to retaliation. She had worked on a project beginning in 2011 for Mr. Dunn, received a good evaluation. Had worked on another project for Ms. Brown, received a good evaluation. She worked for Mr. Sonny, received a good evaluation. Excuse me, counsel. Give us some credit for having read the briefs and being familiar with the facts. The district court dismissed this case for one principal reason. The district judge said that there was no evidence in the record from which a jury could conclude that whatever report or comment Ms. Bailey may have made about her supervisor's harassment or sexual alliance to a subordinate was ever made known to any decision maker in the decision making chain. That was the ground for Judge Casper's decision. And I spent a fair amount of time looking to see if I could find some evidence in the record that would support a finding that such knowledge existed on the part of any company decision maker. And I haven't been able to find it. And I'm hopeful you'll point us to it. Thank you, Your Honor. I think with respect to that point, it relies on inferences. Because if we assume that Ms. Shirley doesn't tell the truth or we assume that Mr. Pelliquin and Mr. Angles had a conversation and they don't tell the truth, then there will be no direct evidence as to that conversation. But we have legions of cases saying that as a general practice, summary judgment can't be defeated simply by saying that the witnesses are lying. Is that Mr. Pelliquin is lying when he says that he wasn't told, that Ms. Shirley was lying when she told the plaintiff that she wouldn't tell anyone? So I'm still looking for the evidentiary link. Well, Your Honor, I think with respect to an inference, you need facts which suggest an inference. I don't think I can come in here and say, hey, these people are lying. So what are those facts that raise the inference? Well, one important fact is we say that Ms. Shirley told Mr. Angles. Now, what is important is after that weekend, Mr. Angles does not come to work. He's offered no explanation as to why he did not come to work. It's clear that we're saying that's an inference as to him being told. He doesn't come forward and say, well, I was deathly ill. He doesn't come forward and say, unfortunately, a friend of mine died or my mother died. He doesn't say that. There's no explanation whatsoever. He just doesn't appear and nobody knows why. Well, take that. Suppose we take that there's an allegation made about him on October 1 or 2 and then again on October 5, and then the following week he doesn't come into work. And you said that's unusual that he would unexpectedly come in. So you want us to draw an inference that someone must have let him know that an allegation had been made, so that's why he was out. Well, I think there's more than that, though, Your Honor. But is that the significance you want us to attribute to his absence from work? Yes, Your Honor, because what we're trying to say is that if he learned of that fact, okay, that all of a sudden people at work know that he's made these advances towards Mr. Recor. Exactly, but that doesn't get you where you need to go. You need us to also be able to infer that he knew that your client made the allegation, not that the client, not that the allegation was made. And that's fine, Your Honor, and I understand when we take that additional leap that he not only knew that his relationship with, what's the fellow's name? Recor. Recor was put into play, but that your client had done it. What fact allows us to draw that inference? Well, Your Honor, I think you have to look at the temporal proximity as to what happened here. Because we say this earlier, we also say this is the conversation with Mr. Pellequin. Now, Mr. Pellequin and Mr. Angles, I think, are friends at work, and I think Mr. Angles says they're friends at work. They talk, they share e-mails, that happens all the time. It just does. And now we're supposed to believe again there's no conversation after that. That's one point. Now all of a sudden Mr. Angles starts going after Ms. Bailey with respect to defective performance. Let's stay with the chronology because I didn't read it quite that way, and maybe I'm wrong. But what I saw was on September 26 there's an e-mail from Angles that's critical on the critical point of your client, and that occurs almost a week before the first allegation is made. And, Your Honor, that's true, but what we're saying there is we have the issue with respect to Mr. Recor. Okay? So Mr. Angles has to go after Mr. Recor. Now we can't ignore Nancy Bailey because Nancy Bailey is a reviewer. So that's what happens. Now let's just look at the meetings, what happens. They don't go in there and talk to Nancy Bailey about the review of all of the preparers. It's about Mr. Recor. Mr. Recor is complaining about a 46-year-old manager making what he feels are propositions to him which he feels are inappropriate. That's the function of the e-mail. I don't think the e-mail is directed at Ms. Bailey. I think it's directed at Mr. Recor. But it's critical of Bailey, and Pellequin clearly reads it as critical of Bailey. Well, there's another issue with respect to Mr. Pellequin. Let's look at Mr. Pellequin and who he is. On September 18th he becomes Ms. Bailey's coach. He's supposed to talk to her. He's supposed to support her. He's supposed to be an advocate for her at Price Waterhouse. That never happens at all. We look at these memos that come out later on, and one of my complaints was, well, where are the documents supporting these memos? Mr. Pellequin never comes forward and says, well, we want to see what those complaints concern. Where are they? Pull them. I'm for Nancy Bailey. I'm her coach. I want to understand what's going on. Never happens. He doesn't talk to her about performance. He doesn't talk to her about this issue. He does nothing. So it was your theory that Pellequin is discriminating, is himself retaliating against her. I thought your theory below was that Anglis was upset that she had reported him hitting on the other guy, and so Anglis gave her bad reviews, and then those bad reviews tainted her file and caused others to terminate her. That's a very different theory than saying Pellequin himself was retaliating against her because she had reported his friend. Well, Your Honor, could I have alleged a claim against Pellequin? Perhaps. Do I want to pursue that claim? Maybe not, because I think it's Anglis. I think the strongest case is against Anglis. But my question is, did you pursue it below? Against Pellequin? Yes. No, I didn't. Did you advocate the theory below that you're asking us to then draw that he was his coach and yet he dropped the ball and all these things? Because otherwise, that hurts you. Well, I understand, but I believe I did raise that below. And what I'm trying to say is with respect to the inference I'm asking the court to draw, I'm just not relying on one particular instance. I'm saying, look, he didn't come to work. He starts to complain about Nancy Bailey. Let's look at complaints outside of recall. When do they begin? They don't begin really until I think October 15th. The memos come out. There's nothing like that. Nancy Bailey works for Mr. Anglis, I think, for two or three months. No complaints. She's fine. In April of 2012, as to working on an IFR project, she gets a superior review, not even a meets expectations review. Then he comes back after being out for a week and in six weeks essentially says she doesn't know what she's doing, gives her a review of five, and rolls her off the project. Really, I think six or seven weeks, that's what happens. And then she's gone. And they're saying, well, she can't find a new job. And I mean, there are issues to that. Never offered a low-level position. She had been out three months longer than she needed to be out. So there are issues as to that as well. But this is what's happening. And we're trying to say, did Mr. Pellicorn tell Mr. Anglis about this? And the inference is, well, based on what happened, you would have to infer that. Because why all of a sudden would Mr. Anglis begin doing what he's doing when he had been receiving the exact same information for three months? It's totally inconsistent. Any manager who is doing his job would have been aware of that information in July or early August. And now for him, all of a sudden in the middle of October to say, oh, my God, this is the end of the world. We need to get rid of this person. Not that there's an error. It's like five, you're gone. In six weeks, he makes that decision. And what I'm trying to say is, there's no reason to do that unless he knows that Nancy Bailey is involved. And I think clearly when you look at the relationship between Mr. Pellicorn and Mr. Anglis, you can infer that Mr. Pellicorn told him. And Mr. Anglis says, hey, I went out. I continue to have dinner with Mr. Anglis and Mr. Pellicorn. They continue to do it. They continue to talk. It's hard for me personally to just believe that this never came up. That Mr. Anglis didn't say, hey, Aaron, what happened here? Give me a little hint. He goes, well, I can't say anything. You know, Bailey and so-and-so came in. You know, I mean, to suggest to me that that couldn't have happened and these facts don't suggest that it could have happened, you know, respectfully, Your Honor, I don't see that. I think there's more than enough here for a jury to believe that that conversation occurred. Otherwise, Mr. Anglis' activities have no basis whatsoever. And even more, if we look at the information that he relies upon. Now, I say, hey, it's vague. Where's the underlying documents? We don't have it. Now, Ms. Bailey explains what happens. Okay, she didn't know this computer problem. Okay, she learned of it from Jamal Lewis. There's no way for her to have known. She talks about these differences with respect to Mr. Anglis and the language. None of that is really disputed. It's not. She just says this is what happens. No one's saying that's wrong. You know, and I even go back to Mr. Anglis not being present. No one's saying there's a reason for that. That's what I'm trying to say. I mean, if there was a reason and he could explain it, then I think we'd all like to know what it is. But we don't know. And the question is, why does everything change so much? And even though there's no claim against Mr. Pelequin, I do think his behavior is enough just with respect to drawing this inference. Respectfully, I don't know that I need a claim against Mr. Pelequin to support that inference. This is a factual issue. And could a jury determine, hey, this guy has, you know, a friendship with Mr. Anglis, and he's not going to do anything to interfere with it? And I think that's really the issue. Is that enough to say, hey, these two had a conversation? Or even that Ms. Hurley had told Mr. Anglis about what had happened? I do think that the connection between Mr. Pelequin and Mr. Anglis is stronger based on what happened. Because there's also no explanation for why Mr. Pelequin didn't have any interaction. What do you say about Presswaterhouse's causation argument, that the actual decision was based on her lack of utilization rather than any of these criticisms? Well, Your Honor, it seems to me that with respect to the lack of utilization, I think there are a number of issues there. First of all, I don't think there's any dispute that Ms. Bailey was on the bench previously, and I think it was eight to ten months. That's my recollection. And she got a rating of four that didn't criticize her for her behavior. It was just like, hey, you're on the bench, you didn't get work. Hey, she got a job, she went out, she got a two for superior performance. Now all of a sudden, she gets a five rating for poor performance. She's rolled off the project early. So now she's got a five rating because they're saying she doesn't know what she's doing, and she's out of work from December, I believe, until March or April. Now let's just assume she got a three, okay? It doesn't have to be a two. She gets a three, she comes off in February, they do the review two months later, okay? She's not in a position then to be discharged, and if we just look at what happened with her being on the bench previously, I think it supports that because her situation, her review were worse. So here it is, she would be in a better position where clearly she would stay, but instead she's discharged. So are you saying the ARC was retaliating? I think the ARC was just given information. They were given this review, which I'm saying is false, okay? It's fabricated. And that's what they're relying on. Are you saying the underutilization was a product of the review? Well, I think it's a product of two things, Your Honor. I think it's a product of her being rolled off early because I think that puts three months into the delay. Wasn't that Pelegrin's decision to roll her off? I think based on the recommendation of Angles. Wasn't that Pelegrin's decision? Well, Your Honor, I understand what you're trying to ask me as the decision-maker, and I understand that. But the thing with a decision-maker, if the decision-maker is provided with false information. Well, I understand that too, but that doesn't mean you can deny who the decision-maker was. I would say that Mr. Angles went to Mr. Pelegrin, but I would not say that Mr. Pelegrin was the sole individual who made that decision. I think Mr. Angles was part of it. Thank you. Good morning. May it please the Court. Mark Batten for the appellee. Your Honors, this appeal is completely detached from the record. Ms. Bailey deals with adverse evidence by denying that it exists and finds supporting evidence by inventing it. And we see that both with respect to the question of Mr. Angles' knowledge of her protected activity and also with the question of causation that was just most recently addressed. Starting with Mr. Angles' knowledge, the first theory is that Ms. Hurley told Mr. Angles over the weekend of October 6th or 7th, and that's why Mr. Angles didn't come to work on Monday the 8th and was out all week. The most important reason that that theory fails, and it's not actually articulated in the briefs or in the district court's decision, but Ms. Bailey testified that she didn't tell Ms. Hurley about her report to Mr. Dillman until the 8th of October, when Mr. Angles has already made the supposed decision to be out of the office all week to plot strategy against Mr. Recor. So the reason that the Hurley approach to Angles' knowledge doesn't work is that Ms. Bailey denies it herself, not to mention that she had said when she spoke to Ms. Hurley the week before that she had actually extracted a promise from Ms. Hurley not to say anything. All they were talking about at that time was, should we tell Mr. Angles about Recor's allegations? Both of them were on the fence about whether to do that. Ms. Bailey said, please don't tell Mr. Angles, and Ms. Hurley promised that she wouldn't. But by the time the supposed conversation happened between Hurley and Angles, Hurley doesn't know that Ms. Bailey has reported anything to Dillman or engaged in any other kind of protected conduct. So there's just nothing to that, and that's in the appendix at 195. But she had discussed this with Hurley prior to her report to Dillman? She had discussed the possibility, yes, that she would report to Dillman. She had discussed the possibility that they should go tell Mr. Angles about Recor's allegations. But Ms. Hurley didn't know that Ms. Bailey actually had engaged in any protected activity until the following week when, under the plaintiff's theory, it was just too late. Your point, there are two points, right? Hurley didn't know that a report had been made or who had made it if one had been made? That's correct. Okay. There also is no evidence, of course, that if Hurley had spoken to Mr. Angles, what was said, that it involved Ms. Bailey at all. For all we know, that invented conversation could have been, you should know that Mr. Recor is saying X, Y, Z, with no mention of Ms. Bailey. It's all pure speculation. The same is true with respect to the theory that Peloponne is the one who told Angles. There is a dispute in the record about whether Mr. Peloponne even knew about the report, about the protected conduct. Again, Mr. Peloponne says he did not know. Ms. Bailey says she told him, although her testimony is all over the place about that. But even assuming that Mr. Peloponne knew of the protected activity, he denies telling Angles. He says, HR told me not to talk about this case with anyone and I honored that request. Mr. Angles says Mr. Peloponne never said anything to me about either Recor or Bailey or protected conduct. And so again, we're left with no actual evidence that a conversation occurred and just the speculation that because they knew each other at work, spoke about work topics that they must also have discussed this other thing that they deny talking about and which human resources had told Mr. Peloponne not to discuss. It is the perfect example of trying to overcome summary judgment by insisting that all the evidence is false, that all the witnesses are lying, and that's just not the way summary judgment works. So unable to present any evidence that anyone told Mr. Angles, the argument that was made in the briefing again this morning is that somehow it should be inferred from Mr. Angles' conduct in terms of criticizing Ms. Bailey's performance, which in the plaintiff's theory arose out of the air after October 15th. But again, the argument can only be made by ignoring the admissible evidence in the record. Ms. Bailey's performance had been criticized by a variety of people for a long time before Mr. Angles even came to know her, including Ms. Tassone. I won't review that evidence in detail, but Ms. Tassone had very specific things to say about Ms. Bailey's performance in her affidavit, which is in the record. There was an ARC assessment subsequent to Ms. Tassone's having filled in, right? But when I tried to look at that, I just saw sort of the rating, but nothing else seemed to be readable. Is there a readable copy in the record? No, there's not, Your Honor. I regret that. Both the ARC that you're talking about and even the performance review, the adverse performance review that is the subject of this case is in this tiny print. That's the way it was produced by PricewaterhouseCoopers. Apparently that's the way they retain it. Those are the best copies that we have of those materials. But in any event, the ARC- I'm sorry. I think there's a step in the chronology that you haven't talked about that I wanted to go over. Angles, when he doesn't show up for work and what inferences can be drawn from that, was this a topic of deposition testimony? Did this issue come up? And if it did, what was said? It did, Your Honor. Thank you. And I meant to mention that because the comment was made this morning that Mr. Angles never addressed it, never gave any explanation. That's not the case. He was asked in deposition, where were you the week of October 8th? And he said he had a family engagement. He said he didn't remember exactly what the nature of it was as he sat there in the deposition room, but that he had a family event that he was attending during that week, and that's why he wasn't at work. So the testimony is, again, returning to this idea that Mr. Angles suddenly began criticizing Ms. Bailey's performance after a spotless record at PricewaterhouseCoopers, the testimony is unrefuted from both Mr. Pelican and Ms. Barbano-Grinder, the HR representative, that Ms. Bailey was assigned to Mr. Angles' team in the first place because of prior performance issues. Two witnesses whom Ms. Bailey supervised on that same Tassone engagement testified in affidavits that Ms. Bailey didn't know what she was doing, that they had to go with her to meetings with attorneys on these foreclosure issues because Ms. Bailey couldn't answer the questions and they had to do it. And not once has Ms. Bailey in her briefing, either in the district court or in this court, addressed the comments of those subordinates. Then, of course, there is, as was mentioned earlier today, the email from Mr. Angles to Mr. Pelican commenting on Ms. Bailey's performance on September 26th. And the idea that it was just about recourse performance and not Bailey's is not supported by the record because the whole idea is Mr. Recore reviews the file, passes it on to Ms. Bailey. She's supposed to correct Recore's mistakes and send it back to him so that by the time a file gets to Mr. Angles, it's been cleaned up. And so if Mr. Angles gets a file that's full of errors, as he says on September 26th, happened repeatedly, it's because Ms. Bailey isn't catching the things that Mr. Recore is failing to do and that's the essence of her job. The defendant made a well-supported motion for summary judgment and the response with respect to Mr. Angles' knowledge was maybe it's all untrue, maybe a jury would find to the contrary, and that's not enough. Let me just briefly address the second part of this, which is the causation issue. There is an awfully long chain between Mr. Angles' allegedly retaliatory conduct and Ms. Bailey's termination. The only thing that Mr. Angles is alleged to have done, really, is to have written a negative performance review. But in the very same document that is the alleged instrument of retaliation, Mr. Pellequin also has an equally lengthy discussion of Ms. Bailey's performance. It is, again, there is no evidence to suggest that Mr. Pellequin's recitation was drawn exclusively or even partly from Angles. His testimony was, I wrote a bad performance review, too, because I sent out Ms. Bailey's work to a half a dozen other reviewers who all got back to me and said, these files are full of mistakes. That's part of the very performance review that is supposed to be the retaliatory thing. Mr. Trombetta said that he argued below that Pellequin was also retaliating. He did not, Your Honor. He did say below that Mr. Pellequin, he raised this point that Mr. Pellequin was the coach, Ms. Bailey's coach, who could have done a better job. But there is no argument that Mr. Pellequin's conduct was itself retaliatory. So there's no way to untangle the effect, if any, down the road of Mr. Angles' comments from Mr. Pellequin's comments. But even if we pass that point and assume that Pellequin's review was retaliatory, for some reason that we don't, that has not been described, and that the discussion by all the reviewers who got back to Mr. Pellequin and said, this is all, these files are all full of errors, was some kind of grand conspiracy, it's not Angles who makes the decision, first of all, to take Ms. Bailey off of the IFR project. The evidence actually is that the recommendation came from Human Resources, originally, Ms. Barbara O'Grinder, that's in her affidavit at page 432 of the appendix. She recommended it to Pellequin. He concurred because of the information that he had collected from other reviewers, and then a partner, Michael Stork, approved the decision. So there are a lot of people involved in that roll-off decision that was made in November. The other thing I want to say about the two, there are actually two ARC committee meetings that result in Ms. Bailey's termination. There's one in April, and then another one in June. And as has been said, Ms. Bailey doesn't know who was on the committee, doesn't know what information they had, isn't able to say that anyone on the ARC knew of her protected conduct. So again, no causal link to any retaliatory activity. With respect to the reasoning for the low rating that the first ARC gives her, and which the second ARC confirms and decides to terminate her, Mr. Dillman's unrebutted testimony was not only that the performance review was of nearly secondary concern, but that the primary issue was that there was no work that Ms. Bailey could do. This whole thing about, well, maybe she would have been on the bench for a shorter time if she hadn't been rolled off prematurely, is irrelevant. Because Mr. Dillman was saying, his testimony is, not that she was on the bench too long, his testimony is, we didn't have anything for her to do. Because the only thing that she was competent to do was very simple validation of forms. And the tax form validation work that she'd done earlier in her career at Price Waterhouse had gone away. The foreclosure review work that she had done most recently wound up at the beginning of 2013, and there was not that anymore. And no one was able to find any work for her to do. So it was not the fact merely that she was on the bench, or how long she was on the bench, it was that they had no work for her to do. And that testimony, again, stands unrebutted. So the only competent evidence showed that Angles was not aware of Bailey's protected conduct, and that in any case the allegedly retaliatory conduct was superseded by other causes that led to her termination, which is the only adverse action alleged. Summary judgment should be affirmed. All right, thank you.